IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PAULA GABRIEL, | CIVIL DIVISION |
| Plaintiff, | No. 2:21-cv-687 |
| v. | |
| XYLEM, INC., | |
| Defendant. | JURY TRIAL DEMANDED |

## COMPLAINT

AND NOW, comes Paula Gabriel, by and through counsel, Robert A. Bracken, Esquire, Charles A. Lamberton, Esquire and Bracken Lamberton, LLC and files the following Complaint and avers as follows:

## PARTIES AND JURISDICTION

1. Plaintiff, Paula Gabriel, is a resident of the Commonwealth of Pennsylvania, with an address of 152 Shroyer Mill Road, Butler, PA 16001. Plaintiff was an employee of Defendant.

2. Defendant Xylem, Inc. ("Xylem") is a limited liability company headquartered at 1 International Drive, Rye Brook, NY 10573.

3. Xylem owned and operated the Zelienople, Pennsylvania location at which Plaintiff worked.

4. Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") on or about June 3, 2020, which was dual-filed with the Pennsylvania Human Relations Commission.

5. Plaintiff was issued a Notice of Right to Sue from the EEOC. *See* Notice attached collectively as Exhibit 1.

6. Plaintiff has complied with all conditions precedent to filing this Complaint.

7. The Court has jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as well as 28 U.S.C. § 1367 for the PHRA claims Plaintiff will bring upon the exhaustion of her administrative remedies.

8. Venue is appropriate in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this Complaint occurred in Butler County, Pennsylvania.

## FACTUAL ALLEGATIONS

9. In September 2018, Xylem hired Gabriel as a Senior Buyer / Head of Procurement.

10. Throughout her approximately eighteen-month employment at Xylem, Gabriel was constantly subjected to the sexual advances of her direct supervisor, Michael Craig.

11. Despite her repeated complaints to human resources and management about Craig's conduct, Xylem took no action to correct it.

12. Instead, Xylem retaliated against Gabriel by denying her opportunities and ultimately terminating her employment.

13. A non-exhaustive list of the harassment to which Gabriel was subjected is detailed herein.

14. Within the first week of her employment, Craig began making sex-based comments to Gabriel, which Gabriel reported to Human Resources Manager Sherri Magill.

15. Magill said that she would get back to Gabriel, but she did not.

16. Craig continued to make inappropriate sex-based comments to Gabriel.

17. For example, in October 2018, Craig told Gabriel that she always looks "sexy."

18. On another occasion, Craig said that he makes women "scream all the time" and wished Gabriel was one of those women.

19. Craig's actions permeated through Xylem's Zelienople office and, resultantly, certain subordinates also made sex-based comments.

20. Moreover, the fact that managers were involved in affairs with co-workers, caused additional unease in this hostile work environment.

21. On or about November 1, 2018, Gabriel told Manager of Operations Sean Petraitis that Craig was sexually harassing her.

22. In response, Petraitis said that Craig is a "good guy" and that Gabriel needed to "learn to get along with him."

23. On or about November 2, 2018, Craig told Gabriel that she looked amazing and should go to lunch with him.

24. When Gabriel said she was busy, Craig said that it was her loss and asked, "you do not want to be a loser at work, do you?"

25. When Gabriel asked what he meant, Craig instructed her to enter his office.

26. Once inside the private office, Craig told Gabriel that if she didn't have sex with him, she would find herself on the outside of the building.

27. Craig also made it known that he and Petraitis are in charge and that Petraitis listens to Craig.

28. Nevertheless, Gabriel rejected Craig's advances.

29. On or about November 11, 2018, Craig blocked Gabriel from passing him in the hallway.

30. Gabriel asked if he could move and Craig said he would if Gabriel kissed him later.

31. Gabriel refused to kiss Craig.

32. Often, Craig would intentionally walk past Gabriel and brush his shoulder against her breasts.

33. This touching was unwanted and offensive.

34. On or about December 1, 2018, Gabriel went into Magill's office and asked Magill to please help her, as Craig was still harassing her.

35. Magill responded: "I have to look out for my job so I can't help you."

36. On or about December 13, 2018, Craig grabbed Gabriel's buttocks at the Xylem holiday party at Bravo in Cranberry Township, PA.

37. Once again, this touching was unwanted and offensive and caused Gabriel, who is married, to feel physically ill.

38. On or about December 14, 2018, Craig said that Gabriel "looked good" and that he wanted to have a party with her in any hotel nearby that Gabriel chose.

39. Gabriel understood that the word "party" meant sex.

40. Gabriel did not respond to Craig's unwanted sexual advance.

41. Later, that day, at the Xylem Christmas Party, Craig told Gabriel that he felt "horny" for her.

42. Craig made this statement to Gabriel after Craig's wife walked away from the table at which they were sitting.

43. On or about January 1, 2019, Gabriel asked Petraitis to keep Craig away from her and to not schedule her to attend business trips with Craig.

44. Gabriel explained to Petraitis that Craig put his hands on her and constantly made unwanted advances toward her.

45. Moreover, Gabriel told Petraitis that she feared one day Craig would try to rape her.

46. Petraitis told Gabriel that he would speak with Craig; however, Petraitis never advised Gabriel whether he spoke with Craig.

47. On or about January 7, 2019, Craig told two subordinate employees named Becky Brenneman and Christina Sanger that he planned to prevent Gabriel from advancing at the company and sought their assistance.

48. On or about January 28, 2019, Gabriel had dinner with Vice President Alberto Bozzi regarding a Procurement Project Manager position that would be opening, which Bozzi believed would be a good fit for Gabriel.

49. On or about February 4, 2019, Craig stared at Gabriel's breasts and said, "I would like to be like a baby and suck on those."

50. On or about March 1, 2019, Gabriel called Senior Human Resources Manager Marie Hink and complained that Craig was sexually harassing her and recruiting employees to retaliate against her.

51. In response, Hink said that she trusts her management team and that there was no reason to look into Gabriel's accusations.

52. On or about March 5, 2019, Craig made a comment to Gabriel about a dirty joke that another co-worker had told and suggested that he and Gabriel have sex on his desk.

53. On or about April 20, 2019, Craig entered Gabriel's office, closed the door, spread his legs and began touching his private area.

54. Gabriel told Craig to stop and when he would not, she immediately left her office.

55. On May 9, Gabriel received a retaliatory write-up that was orchestrated by Craig, as a result of Gabriel having denied his sexual advances.

56. On or about June 1, 2019, Gabriel asked Petraitis permission to cease the 8 a.m. daily meetings with Craig, as his behavior was affecting her health.

57. In response, Petraitis said that it was hard for him to do anything because he and Craig had been friends for many years.

58. Thus, despite being advised that Craig's harassment was physically harming Gabriel, Petraitis still required Gabriel to meet with Craig daily and alone.

59. On June 15, 2019, Craig winked at Gabriel and asked her to come over to speak to him in the parking lot, but she refused.

60. On or about July 20, 2019, Gabriel was instructed to move her office after Brenneman made a complaint about Gabriel's voice.

61. Moreover, Xylem removed Gabriel's direct reports.

62. On or about August 15, 2019, Craig told Gabriel that she should leave work early with him and that if she did not "play nice," she might lose her job.

63. In October 2019, Gabriel applied for the Procurement Project Manager position that Bozzi suggested would be a good fit.

64. In addition to wanting a promotion within the company, Gabriel also sought this position because it would give her the opportunity to get away from Craig.

65. In December 2019, Craig asked Gabriel why she would not be "good with" him.

66. Gabriel understood Craig's statement to mean "have sex with" him.

67. Once again, Gabriel rejected Craig's advances.

68. On January 29, 2020, the Zelienople office was scheduled to be visited by an executive named Tobias Engström, who was flying from Sweden to the United States to meet with Gabriel and finalize the offer to her of the Procurement Project Manager position.

69. On January 29, 2020, before Engström arrived, Craig told Gabriel to enter his office and close the door.

70. Gabriel asked if this discussion could wait, as she was preparing for Engström's arrival, but Craig told her that it could not.

71. Craig then proceeded to tell Gabriel that she was hot and that if she did not sleep with him, she could kiss her promotion goodbye.

72. Craig also referenced that he had slept with other women in the building, which was something already known by Gabriel and, resultantly, contributed to the hostile work environment.

73. Gabriel again rejected Craig.

74. Later that day, Craig and Petraitis told Engström not to hire Gabriel.

75. On January 30, 2020, Gabriel reported Craig's sexual harassment to Petraitis in detail and expressed concern that it would prevent her from obtaining the promotion she deserved.

76. Gabriel said that she deserved the promotion and that she wanted it because it would enable her to not work near Craig.

77. On January 31, 2020, Hiring Manager Christian Hey, called Gabriel after speaking with Engström.

78. Hay stated that he dreaded making this call because the plan was for Engström to travel to the United States, meet Gabriel and offer her the position.

79. Hay explained, however, that Craig and Petraitis made a big deal about her leaving Craig's team and that he could not offer her the position.

80. On February 4, 2020, Gabriel was scheduled to meet with Petraitis, Hink and another superior named Lisa Donegan.

81. Earlier that day and just prior to this meeting, Craig told Gabriel that it was her last chance to sleep with him.

82. Again, Gabriel rejected Craig.

83. At the February 4, 2020 meeting, Gabriel was fired.

## COUNT I - SEX DISCRIMINATION

84. Plaintiff incorporates by reference herein Paragraphs 1 through 83 of the Complaint as if more fully set forth at length herein.

85. Defendant's conduct described above and herein constitutes gender / sex discrimination and is a violation of Title VII.

86. Defendant's discriminatory conduct was used as a basis for employment decisions affecting Plaintiff.

87. The conduct described above and herein was unlawful gender / sex discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect and did affect Plaintiff.

88. As a direct and proximate result of Defendant's unlawful, willful, deliberate discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

89. As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including but not limited emotional distress and anxiety.

90. As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount to be determined with attorneys' fees and costs assessed as well as any other relief or damages deemed proper by the Court.

## COUNT II – SEXUAL HARASSMENT

91. Plaintiff incorporates by reference herein Paragraphs 1 through 90 of the Complaint as if more fully set forth at length herein.

92. Defendant's conduct described above and herein constitutes sexual harassment and is a violation of Title VII.

93. The conduct described above and herein was unwelcome and unwanted and constitutes sexual advances and/or other verbal or physical conduct of a sexual nature.

94. The conduct described above and herein was explicitly and/or implicitly a term of condition of Plaintiff's employment.

95. The conduct described above and herein was sexually harassing workplace behavior and quid pro quo sexual harassment.

96. Submission to such conduct was made either an explicit and/or implicit term or condition of Plaintiff's employment.

97. Submission to or rejection of the conduct was used as a basis for employment decisions affecting Plaintiff.

98. The conduct described also had the purpose or effect of unreasonably interfering with Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

99. The conduct described above and herein was unlawful sexual

discrimination committed by Defendant's employees, servants and/or agents who had the effective ability to influence employment actions that could affect Plaintiff, including but not limited to firing.

100. As a direct and proximate result of Defendant's unlawful, willful, deliberate harassment and discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

101. As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from physical problems including but not limited to emotional distress and anxiety.

102. By reason of Defendant's unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

103. As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount to be determined with attorneys' fees and costs assessed as well as any other relief or damages deemed proper by the Court.

## COUNT III – HOSTILE WORK ENVIRONMENT

104. Plaintiff incorporates by reference herein Paragraphs 1 through 103 of the Complaint as if more fully set forth at length herein.

105. Defendant's conduct described above and herein constitutes discrimination.

106. The conduct described above and herein was unwelcome and unwanted.

107. The conduct described had the purpose or effect of unreasonably interfering with Plaintiff's work performance and/or creating an intimidating, hostile or offensive work environment.

108. The unwelcome and unlawful conduct was both subjectively abusive to Plaintiff and also objectively severe and pervasive enough to create a work environment that a reasonable person would find abusive.

109. Such conduct, as described above and herein, was frequent, severe, pervasive, physically threatening and humiliating, interfered with work performance, had an adverse effect of Plaintiff's psychological well-being and was conducted by harasser(s) who were superior in the organization.

110. As a direct and proximate result of Defendant's unlawful, willful, deliberate harassment and discrimination against Plaintiff, Plaintiff incurred substantial losses, continuing in their nature, including but not limited to loss of wages and loss of benefits, harm to her reputation, medical expenses, adverse effects on her career and diminished earning capacity.

111. As a direct and proximate result of Defendant's unlawful, willful and deliberate discrimination and harassment against Plaintiff, Plaintiff suffered from

physical problems including emotional distress and anxiety.

112. By reason of Defendant's unlawful, willful, outrageous and deliberate misconduct towards Plaintiff, Plaintiff is entitled to recover both compensatory and punitive damages in addition to actual damages.

113. As a result of Defendant's discriminatory conduct, Plaintiff is entitled to all available damages pursuant to Title VII, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) equitable relief including employment, reinstatement and promotion; (4) attorneys' fees and costs; and (5) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendant in an amount to be determined with attorneys' fees and costs assessed as well as any other relief or damages deemed proper by the Court.

## COUNT IV - UNLAWFUL RETALIATION

114. Plaintiff incorporates by reference herein Paragraphs 1 through 113 of the Complaint as if more fully set forth at length herein.

115. Defendant's conduct described above and herein constitutes retaliation, in violation of the law.

116. Defendant's retaliation against Plaintiff, which includes but is not limited to the denial of her promotion and her termination, was the result of her objecting to the conduct she was experiencing as set forth throughout the Complaint.

117. As a direct and proximate result of Defendant's unlawful, willful, deliberate retaliation, Plaintiff incurred substantial losses, continuing in their nature,

including but not limited to loss of wages, harm to her reputation, adverse effects on her career, physical and emotional pain and suffering, medical care, treatment and expenses, and diminished earning capacity.

118.  As a result of Defendant's retaliatory conduct, Plaintiff is entitled to all available damages, including but not limited to damages for the following: (1) all available compensatory damages; (2) economic and non-economic losses; (3) attorneys' fees and costs; and (4) punitive damages.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests judgment be rendered in her favor and against Defendants in an amount to be determined with attorneys' fees and costs assessed as well as any other relief or damages deemed proper by the Court.

## PENNSYLVANIA HUMAN RELATIONS ACT

119.  Plaintiff incorporates Paragraphs 1 through 118 of the Complaint as if fully set forth herein.

120.  Plaintiff intends to assert a cause of action pursuant to the Pennsylvania Human Relations Act against Xylem as well as Michael Craig and Sean Petraitis, who will be added as additional defendants.

121.  Plaintiff will request leave to amend to bring a cause of action under the Pennsylvania Human Relations Act, 43 P.S. § 951, et seq. against Xylem, Michael Craig and Sean Petraitis, to secure full restitution of all damages resulting from Defendant's violation of the provision of the Pennsylvania Human Relations Act and for such other and further relief as may be appropriate upon the exhaustion of administrative remedies to the extent that the PHRA claims are not resolved before the PHRC.

122. Jurisdiction of this action will be based on the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

123. Plaintiff's filings with the EEOC constituted an initiation of proceedings with the Pennsylvania Human Relations Commission pursuant to and by operation of the work sharing agreement between the EEOC and that agency.

124. Accordingly, Plaintiff will move to amend the complaint to affirmatively assert PHRA claims upon the exhaustion of administrative remedies.

**JURY TRIAL DEMANDED**

                           **BRACKEN LAMBERTON, LLC**

By _____
      Robert A. Bracken
      Charles A. Lamberton
      707 Grant Street
      Gulf Tower, Suite 1705
      Pittsburgh, PA 15219
      *Counsel for Plaintiff*